TAMAFILI SUISALA, Petitioner

v.

MOAALI'ITELE K. TU'UFULI, Commissioner
of Public Safety, and FUE TUITELELEAPAGA,
Warden, Tafuna Correctional Facility, Respondents

High Court of American Samoa
Trial Division

CA No. 130-87

October 7, 1987

Before KRUSE, Associate Justice, LUALEMAGA, Associate Judge, and VAIVAO, Associate Judge

Counsel: For Petitioner, Frank Swett
For Respondents, James Doherty,
Assistant Attorney General

Petitioner, Tamafili Suisala, prays for a writ of habeas corpus to contest the validity of his incarceration pursuant to judgment and sentence entered by this court in American Samoa Government v. Tamafili Suisala, CR Nos. 4 & 5-85.

Petitioner was initially held over to the High Court to answer the charges in CR No. 4-85 of ten counts of embezzlement, ten counts of forgery, and one count of tampering with a witness in violation of various provisions of the Criminal Code. Consequent to a plea bargain, the information was amended to contain eight counts of embezzlement and one count of tampering, with the other matters being dismissed. Petitioner, who was at all times represented by the Public Defender, entered pleas of guilt to the information as amended.

With regard to CR No. 5-85, petitioner was initially charged with thirty-one counts of embezzlement and thirty-one counts of forgery. The information, as a result of plea bargaining, was amended to contain three counts of embezzlement with the dismissal of the others. Petitioner entered herewith pleas of guilt respectively.

Resultantly, petitioner was adjudged and sentenced on the consolidated eleven counts of embezzlement to terms of imprisonment of seven years for each count, with sentences to run concurrently. He was further sentenced to a term of five years imprisonment in connection with the count of tampering, which sentence was to run consecutively with the others.

Petitioner's grounds for relief under the present proceedings are:

(a) that petitioner in the aforementioned criminal matters was denied his constitutional right to effective assistance of counsel in derogation of his sixth amendment rights under the United States Constitution, and his rights pursuant to art. I, § 6 of the Revised Constitution of American Samoa; and

(b) that the Court in the said criminal matters did not establish a factual basis for accepting pleas of guilt and that a verbatim record

17

of the plea bargain proceedings was no longer available.

Good cause appearing, the writ was issued to respondents herein, and petitioner was granted an evidentiary hearing on his allegations. Petitioner appeared with his Counsel, Frank Swett, and respondents with Assistant Attorney General James Doherty.

HABEAS CORPUS

The common law writ of Habeas Corpus ad subjiciendum, or "the great writ" referred to in the federal constitution, art. I, § 9, is also preserved and made available in the Territory by art. I, § 7 of the Revised Constitution of American Samoa. The trial division of the High Court of American Samoa has, by statute, specific jurisdiction to issue "all writs". See A.S.C.A. § 3.0208 (a)(7).

Historically, the writ was designed to obtain immediate relief from illegal detention, and in this regard the purpose of the habeas corpus proceeding '. . . is not to inquire into the criminal act complained of, but into the right of liberty notwithstanding the act." Ex parte Tong, 108 U.S. 556, 559 (1883). The proceeding is not part of the underlying criminal case, but is an independent, collateral attack on the conviction. Peyton v. Rowe, 391 U.S. 54 (1968); Fay v. Noia, 372 U.S. 391 (1963); Ex parte Tong, supra. Further, habeas corpus is not a substitute for a writ of error nor is it in any sense an appeal, and therefore the writ is not the proper means by which to assail mere errors and irregularities in criminal proceedings. Eagles v. United States, 329 U.S. 304 (1946); Smith v. Bennett, 365 U.S. 708 (1961).

On the other hand, the writ reaches errors of constitutional dimensions. As the Supreme Court stated in Preiser v. Rodriguez, 411 U.S. 475, 485 (1973), "[O]ver the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction." (Citations omitted).

18

With these preliminary observations, we consider petitioner's claims.

## DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

Petitioner alleges deprivation of sixth amendment rights in that his court-appointed counsel, the Public Defender: "failed to use basic methods of discovery"; failed to interview the former president of the Development Bank, Auina To'oto'o, whom petitioner considered a "key witness" to his defense; failed to undertake, or was minimal with, pre-trial investigation; failed to explain to petitioner that consecutive sentences could be imposed; failed to inform the Court of facts consistent with petitioner's innocence, which should have been placed before the Court prior to the acceptance of guilty pleas; and failed to make a post-trial motion for reduction of sentence, or to inform petitioner of his right to such a motion.

At least since <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), it has been settled law that the right to counsel secured by the sixth amendment, and made applicable to the states by the fourteenth amendment, is a fundamental right to a fair trial. <u>See also</u> <u>Hamilton v. Alabama</u>, 368 U.S. 52 (1961). This right to counsel is also part of the fundamental law in the Territory by virtue of article I, section 6 of the Revised Constitution of American Samoa and statutorily embodied in A.S.C.A §§ 46.0502 and 46.1001.

In expanding on this right, the Supreme Court recently clarified that the sixth amendment goes beyond the perfunctory appointment of counsel and the perfunctory performance of counsel's services. In <u>United States v. Cronic</u>, 466 U.S. 648 (1984), the Court reiterated that the right to counsel is the right to "effective" assistance of counsel. The Court went on to state that the standard for effectiveness mandated by the sixth amendment is:

> the right of the accused to require the prosecution's case to survive the crucible of meaningful adversary testing. When a true adversarial criminal trial has been conducted --- even if defense counsel may have made demonstrable errors --- the kind of testing envisioned by the Sixth Amendment has occurred.

19

*Id*. at 656.  By way of footnote, the Court added:

> Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt. And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances.

*Id.* at n. 19.

In the Court's view, the focus of the inquiry is not on the relationship of the criminal defendant and his lawyer but on whether there has been meaningful adversarial confrontation. The accused in order to make out a claim for "ineffective assistance" can only do so by pointing to specific errors made by counsel at trial.

Also in a decision handed down the same day, *Strickland v. Washington*, 466 U.S. 668 (1984), the Court talked of "effectiveness" as being measured against an objective standard of "reasonableness" under prevailing professional norms as reflected in American Bar Association standards and the like. The Court was also careful to caution that such standards were but guides to determine reasonableness, and reaffirmed established judicial restraint from second guessing counsel's tactical decisions from hindsight.

The Court in both cases made clear also that the burden of proving ineffectiveness of counsel, falling below the constitutional measure, lay with the defendant. The standard of proof is viewed against a strong presumption of reliability, in favor of effectiveness, and not only must the accused sufficiently identify unreasonable errors on the part of trial counsel, he must also demonstrate that absent such errors, it would be

20

reasonably likely that the result of the case would have been different.

Given these guides, we turn to petitioner's proofs.

We find petitioner's allegations concerning lack of pretrial discovery and investigation to be entirely without foundation. Against the absence of any evidence by petitioner in this regard, we find the Court's files on the criminal matters to be abundantly evident with extensive pre-trial discovery measures. We also accept the evidence of the Public Defender, which was undisputed by petitioner, that his office undertook numerous interviews of potential witnesses and reviews of documented evidence produced in connection with the charges. To this end, the Public Defender also submitted his work files. A perusal of these files highlights petitioner's allegations as either being made with abject recklessness or by outright fabrication.

The Public Defender testified that petitioner was initially charged with some sixty or eighty counts of embezzlement and forgery and he was informed of a number of other potential charges being processed by the Attorney General. In response to discovery, his office obtained many documents in the way of checks and accounts, as well as all the police and investigation reports leading up to the charges. He recalled numerous conferences with petitioner on this material. In the course of a number of investigations he was pursuing, he talked to different witnesses and people, and confronted petitioner with a number of inconsistencies he found with what petitioner had relayed to him. He further stated that this was not the usual case, in that he did not initiate dialogue on plea arrangement. It was the client who earlier urged the Public Defender to attempt to secure the "best deal."

When he entered into plea negotiation, the Public Defender testified that he kept petitioner informed during their various meetings. He further added that he had always advised the petitioner that he was prepared for trial if petitioner was not satisfied with the resulting plea agreement. In the course of these discussions with his client the Public Defender reviewed the possibility of

21

winning and losing, and advised his client of the potential scope of punishment.[1]

On the other hand, the extent of petitioner's testimony before us was the attempt to impress innocence. He testified that the $75,000 which he was accused of taking from Development Bank was utilized to paint and repair the Lumana'i Building, belonging to the bank. In support of this, petitioner invited the Court to consider the fact that Chief Justice Gardner, who presided at the criminal matters, had sent an investigator to Western Samoa in the attempt to discover where the money went. That investigation did not reveal any evidence of the money having gone to Western Samoa. On the other hand, petitioner claims, the money was neither visible in American Samoa, given his assets and the extent of his liabilities to the local banks.

As alluded to above, these proceedings are concerned neither with guilt nor innocence. Ex parte Tong, supra. Rather, these proceedings are concerned with the legality or illegality of petitioner's detainment notwithstanding the fact of conviction. While petitioner has complained of the ineffective assistance of counsel with pre-trial duties, he has utterly failed in his burden to this regard. On the other hand, the evidence has been overwhelmingly to the contrary and shows the Public Defender to have done exactly what is demanded of him by prevailing professional norms. More will be said on petitioner's above testimony.

On petitioner's other allegations concerning ineffective representation of counsel, we hold that petitioner has failed, even to attempt, to discharge the burden required of him.

The importance he placed in the testimony of Auina To'oto'o is that the latter as then-president of the Development Bank had sanctioned the paint and repair work --- and therefore the expenditures

---

[1] Petitioner, it will be noted, also complains of counsel for failing to advise him that sentences may be consecutive. Yet petitioner at the hearing herein attempted to frame the additional argument of "coercion to plea", in that counsel had waved at him the prospect of consecutive sentences.

22

--- to the Lumana'i Building which petitioner had undertaken.

We fail to see how this could have influenced a different outcome in the criminal proceedings. Firstly, counsel was unable to talk to Mr. To'oto'o, since Mr. To'oto'o was also criminally charged at the time with offenses of a similar import, and he was at the time under the advice of his own counsel to remain silent. Secondly, we are reluctant to second guess counsel's tactical strategy if, as petitioner alleges, counsel did not feel that the Court would believe Auina To'oto'o. Thirdly, it is less than reasonably likely that the knowledge and complicity of Mr. To'oto'o (who was petitioner's superior at the bank) in the fact of misappropriation of bank funds would constitute the defense that would alter the outcome of the criminal matters. Indeed, in the light of other matters we discovered on record, the attempt of such a defense would approach a "useless charade".

On his charge that counsel failed to place before the Court facts consistent with innocence, the facts alluded to are those related to the $75,000 being expended on the Lumana'i Building. Again, how this would alter the outcome of the criminal proceedings is unclear. In any event, petitioner himself related this story to the Court at his sentencing on March 15, 1987, as evident by the transcripts of those proceedings. For all petitioner's concerns, the facts or allegations he desired before the Court were in fact before the trial court at the time.

Petitioner also faults counsel in failing to explain to him the meaning of consecutive sentences. Petitioner's testimony in this regard is the exact opposite of the Public Defender's, who testified that he had discussed with petitioner the potential range of sentence.

We have no reason to doubt the Public Defender's credibility but have been presented cause to doubt petitioner's, in the manner of his making other positive and serious allegations without the semblance of foundation. We choose in favor of the Public Defender's recollection and accordingly need not decide whether counsel's actual failing to review with a client the meaning of consecutive sentences, gives rise to a

23

constitutional or fundamental flaw, violative of the sixth amendment.

Finally petitioner seeks habeas corpus relief in that counsel failed to make a post judgment motion for a reduction in sentence. On this ground, the Court is unable to conclude that such a failure approaches constitutional dimensions. At the sentencing proceedings, a number of impressive character witnesses were called on petitioner's behalf. Even a medical report on petitioner's health was presented to the Court in mitigation of sentence. These matters considered, the Court rendered sentence accordingly. There has been no showing by petitioner herein of any additional grounds which would subsequently move a change of sentence given. Indeed the sentences rendered were within the lawful limits provided by statute and within the Court's jurisdiction, and accordingly the sentences in no way touch on any suggestion of illegal detention. The ground as advanced is incontextual and inappropriate to these proceedings.

On the foregoing, it is the conclusion of the Court that petitioner has failed to establish that he was without the effective assistance of counsel within the constitutional meaning of that term.

### FAILURE TO FIND A FACTUAL BASIS

Rule 11(f) of the Trial Court's Rules of Criminal Procedure provides as follows:

> Notwithstanding the acceptance of a plea of guilty, the Court should not enter a judgment upon such a plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

As noted by the Advisory Committee on the Federal Rules of Criminal Procedure, Rule 11(f) does not specify that any particular type of inquiry be made. However, in Santobello v. New York, 404 U.S. 257 (1971), the Court saw the rule as requiring the sentencing judge to develop on the record, the factual basis for the guilty plea, for example by having the accused describe the conduct giving rise to the charge. See also United States v. Rivera-Ramirez, 715 F.2d 453 (9th Cir. 1983). The cases have also admitted a number of other alternatives to satisfy the rule's requirement. For example,

24

the judge may summarize the indictment and ask the defendant if he understands the charge and whether he committed the enumerated acts. It is not necessary that the defendant establish in his own words the factual basis. United States v. Lovelace, 683 F.2d 248 (7th Cir. 1982). The indictment itself may be specifically sufficient to establish the factual basis. United States v. Isble, 468 F. Supp. 152 (E.D. Tenn. 1979). Indeed, in United States v. Kritz, 586 F.2d 1178 (8th Cir. 1978), cert. denied, 442 U.S. 945, it was held that the exercise could be accomplished even without the defendant being addressed personally.

The rule itself envisages that the Court's evaluation of a sufficient factual basis is not limited in time to the arraignment or T.C.R.Cr.P. Rule 11 hearing stage. The determination need not be made until prior to the time of judgment and sentencing and it is open to the court to look to other and additional evidence sufficiently articulated on the record. See, e.g., United States v. Welterlin, 583 F.2d 346 (7th Cir. 1978), cert. denied, 439 U.S. 1127; Knight v. United Notes, 611 F.2d 918 (1st Cir. 1979).

With the foregoing comments, we look to petitioner Suisala's contention.

Contrary to petitioner's assertion that a verbatim record of the criminal proceedings is not available, this Court has secured a transcript of those proceedings and copies have been supplied the parties. We also find as part of the record transcripts of depositions duly taken to preserve the testimony of witnesses Peni Fatu and Vevesi Gaopulu.

The record reflects that on February 22, 1985 the trial court was informed of a plea arrangement giving rise to amendments to the information and a motion for change of plea. Prior to taking the pleas, the Court directly informed defendant that as a consequence of changing plea, defendant would necessarily waive his right to a trial by jury, his right to confront witnesses, and his right against self-incrimination. Counsel for plaintiff waived the reading of the resulting information and defendant personally entered pleas to the various enumerated counts. The court further ordered a presentence investigation and invited the

petitioner to give his "version of this unfortunate situation."

On or about March 15, 1985, the Court, prior to sentencing, invited the defendant to explain how the embezzled funds were expended. Defendant generally answered that the amount of $75,000 was used to do repairs to the Lumana'i Building as well as to pay him for the repair work. Defendant also testified that while he was getting this special remuneration for attending to the Lumana'i repair work, he was also drawing regular salary from the bank as vice president. He decided to plead guilty in that part of the embezzled funds came to him personally, and he was aware on the advice of counsel that embezzlement was embezzlement whether the amount involved was one penny or $80,000.

The prosecution, on the other hand, had a different version on the $75,000 which was presented to Court. Some thirty-one checks totalling $20,851 purportedly went to an Atamate Uta as annual stipend for janitorial services at the Lumana'i Building. The attorney general had an affidavit from Mr. Uta that petitioner presented him with checks of $650 every two weeks for his signature while Mr. Uta actually received only $250. On the money that was said to have been used to paint the Lumana'i Building, checks totalling $26,000.00 were issued to a Peni Fatu, and checks totalling $27,700.00 were issued to a Vevesi Gaopulu. The attorney general stated that while these men had worked on painting the Lumana'i Building, both were very surprised when apprised of the amounts said to have been paid to them by the Development Bank. It was also noted that some of these checks were signed by petitioner Suisala, who had signatory authority with the Development Bank.

The deposition of Vevesi Gaopulu revealed that he was a citizen of Western Samoa residing in American Samoa under the sponsorship of the defendant Suisala. He acknowledged working temporarily at the Lumana'i Building for some three to four months and was paid $70 to $80 in cash by Suisala on a weekly basis. Mr. Gaopulu at deposition was presented a series of Development Bank checks made out to his name in the following amounts: $1,750; $950; $4,250; $5,500; $5,000; $4,500; and $5,750. He denied ever seeing these checks before or endorsing the same for payment.

26

Similarly, with the deposition of Peni Fatu we see the same scenario. In addition, Mr. Fatu te·tified about Mr. Suisala's giving him $500 to leave for Western Samoa until the criminal proceedings with Suisala were concluded. Mr. Fatu attempted to depart the territory but was prevented by Immigration Officers owing to the pending cases. Mr. Fatu then met up again with Suisala, who took back his $500 and suggested that Fatu find a place to hide.

Considering the foregoing, we conclude that the criminal court had more than an adequate record to sustain a factual basis for the guilty pleas, and for judgment to be entered accordingly. In so concluding, we find that we need not intimate a view one way or other on whether an actual failing by a criminal court to comply with T.C.R.Cr.P. Rule 11(f) would constitute a constitutional or fundamental error that would give rise to habeas corpus relief.

CONCLUSION

It is the conclusion of the Court that the petition for habeas corpus relief shall be denied and that custody of the petitioner shall revert to respondents and the Executive Branch in accordance with judgment and sentence entered in cases docketed CR Nos. 4 & 5-85.

It is so ORDERED.